UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

IN RE:                          )
                                )
Maurice Dale Swiggett,          )
                                )   Case No. 12-81015C-11D
        Debtor.                 )
                                )

MEMORANDUM OPINION

This case came before the court on September 6, 2012, for hearing on motions to dismiss this case filed on behalf of William C. Mann and by the United States Bankruptcy Administrator. Having considered the motions to dismiss, the objection filed by the Debtor, the matters of record in this case and the presentations made by or behalf of the parties at the hearing, the court makes the following findings and conclusions pursuant to Rules 9014 and 7052 of the Federal Rules of Bankruptcy Procedure.

1. The Debtor is the defendant in a civil action pending in the United States District Court for the Eastern District of North Carolina wherein the plaintiff, William C. Mann, is seeking to recover damages for libel by the Debtor ("Civil Action"). Summary judgment has been entered against the Debtor in the Civil Action on the issue of liability. A hearing in the Civil Action was scheduled for May 24, 2012, for a determination of the amount of the damages to be awarded the plaintiff.

2. On May 22, 2012, the Debtor filed a petition in this court seeking relief under chapter 12 of the Bankruptcy Code in case number 12-80774.

3. As a result of the commencement of the chapter 12 case, the hearing in the Civil Action for May 24, 2012, was cancelled.

4. Even though, under section 109(f) of the Bankruptcy Code, only a family farmer or family fisherman may be a debtor under chapter 12, when the chapter 12 case was filed, the Debtor was neither a family farmer nor a family fisherman and hence was not eligible to seek relief under chapter 12. The Debtor knew that he was not a family farmer or a family fisherman and filed the chapter 12 case solely in order to prevent the hearing in the Civil Action scheduled for May 24, 2012, from being held and to delay further proceedings in the Civil Action.

5. In addition to not being a family farmer or family fisherman, the Debtor filed the chapter 12 case without obtaining credit counseling as required under section 109(h) and thus was not eligible to be a debtor under any chapter of the Bankruptcy Code. As a result, the chapter 12 case was dismissed by an order entered on June 28, 2012.

6. Following the dismissal of the chapter 12 case, on July 10, 2012, another hearing on damages was scheduled in the Civil Action for July 19, 2012.

7. On July 9, 2012, this case was commenced by the Debtor filing a petition for relief under chapter 11 of the Bankruptcy Code.

8. The Debtor commenced this case in order to prevent a

hearing from being held in the Civil Action and to delay further proceedings in the Civil Action.

9. As a result of the commencement of this case, the hearing scheduled in the Civil Action for July 19, 2012, in fact, was cancelled and had not been rescheduled as of the date of the hearing on the motions to dismiss.

10. The Debtor's schedules in this case state that the Debtor is self employed and reflect that his gross income is $760.00 per month, consisting of "SSI" of $698.00 per month and "EBT" of $62.00 per month.

11. The assets listed in the Debtor's schedules consist of miscellaneous personal property valued at $4,520.00 and something described in Schedule A as "Intellectual contribution by Debtor & Creditors for future acquisition" which the Debtor apparently contends is somehow related to real property which is not even owned by the Debtor and which the Debtor lists as having an unknown value. A later filing by the Debtor states that the Debtor "has no monetary assets or real properties, however, there are intellectual properties of the Debtor's Estate as determined by a quorum of Creditors." (Docket #43, p. 3). The exact nature and value, if any, of the "intellectual properties" is unclear and at best are a matter of conjecture.

## DISCUSSION AND CONCLUSIONS OF LAW

12. A voluntary Chapter 11 petition may be dismissed at the

very outset of the case if there was a lack of good faith in the filing of the petition. Carolin Corp. v. Miller, 886 F.2d 693, 700 (4th Cir. 1989). In Carolin the Court of Appeals adopted a standard requiring that both objective futility and subjective bad faith be shown in order to warrant dismissals for want of good faith in filing. Id. at 700-01. The principle guidelines to be followed in making the two-pronged inquiry required by the Carolin case are: the court should consider the totality of the circumstances; there is no exhaustive list of factors which should be considered; there is no single factor that will necessarily lead to a finding of bad faith; and the overall aim of the two-pronged inquiry is to determine whether the purposes of the Bankruptcy Code would be furthered or advanced by permitting the Chapter 11 petition to proceed past filing. Id. at 701.

13. The objective futility inquiry is designed to insure that there is embodied in the petition "some relation to the statutory objective of resuscitating a financially troubled [debtor]." In re Coastal Cable TV, Inc., 709 F.2d 762, 765 (1st Cir. 1983). The criteria for making this determination where the debtor has an ongoing business is whether there is any going concern value to preserve on the part of the debtor and any realistic possibility of an effective reorganization. Carolin, 886 F.2d at 701-02. In a liquidation context, the objective futility inquiry is whether the petition represents an objectively futile attempt to achieve the

more general goal of resuscitating a financially troubled debtor. In re Coleman, 426 F.3d 719, 728 (4th Cir. 2005). After applying the foregoing criteria in the present case, the court is satisfied that objective futility exists in this case.

14. The Debtor filed a "Work-out Plan Proposal" (Docket #43) on August 7, 2012, which describes the manner in which he proposes to proceed in this case. While this document is confusing and difficult to follow, it is apparent that what the Debtor proposes in this case is not a plan of reorganization in the sense contemplated under chapter 11 of the Bankruptcy Code nor is the Debtor's proposed course of action something that is remotely within the capacity and ability, financial and otherwise, of the Debtor.

15. It appears from his Work-out Plan that the Debtor mistakenly believes that chapter 11 and this case can be utilized to address perceived environmental and water quality issues related to the environment as a whole or to properties owned by other persons or entities and to address perceived problems related to the "overall economy." The Work-out Plan states that a "majority of Creditors were sought out and assembled by the Debtor to address issues of water quality and availability issues, as well as real estate projects adhering to the highest and best use principle." The conclusion in the Debtor's "Work-out Plan" states:

> The Debtor and the majority of the Creditors of the Debtor's Estate are firmly committed to

          moving forward with logical and reasonable solution to many of the existing problems which are adversely impacting our overall economy, in turn giving a much needed boost to job creation for existing skills sets.

16. The Work-out Plan recites that the Debtor "has no monetary assets or real properties" and this is confirmed by the schedules filed by the Debtor. Even though the Debtor is without money or property and has income barely sufficient to subsist on, the Work-out Plan proposes a grandiose and totally implausible scheme involving the formation of "new LLC's for the following to acquire penny stock companies for the purpose of expansion to public offerings" and then lists nine new companies that are to be formed to engage in new businesses. As described in the Debtor's Work-out Plan, these new businesses would be involved in research and development of methodology for retrofitting existing vehicles to become electric hybrids, motor racing, acquisition and development of golf courses, hotel operations, construction, waterworks, rail locomotion, "spirits" and gaming. Also proposed are a water quality defense fund, a non-profit credit union and a "legal settlement foundation." Other than a vague reference to "public offerings" and speculative recoveries anticipated in litigation that the Debtor has filed or intends to file, there is no description of how this illusory business empire could possibly be created and funded.

17. Certain "Immediate Projects" also are described by the

Debtor in his Work-out Plan. The first project involves the Quarry Hills golf course located in Alamance County. Pursuant to this project, the Debtor and a team of experts he says he has assembled will "take over" operations of Quarry Hills Country Club and Golf Course in order to restore amenities, restore value to residents' collateral, provide job creation and "research and development of installing unique lodging within or in close proximity of this development." Exactly in what manner this court or any court could authorize or empower the Debtor and his team of experts to "take over" a golf course property owned by others is not addressed in the Work-out Plan and, obviously, is an implausible and outlandish proposition and certainly not within the purview of chapter 11.

18. Another "Immediate Project" described by the Debtor involves the VantageSouth Bank located in Burlington, North Carolina. Pursuant to this project, the Debtor and his team of experts will "work with" VantageSouth Bank officials and directors to re-evaluate the Bank's position on lending practices, identify any "toxic assets" on the books of the Bank and to restore faith among the Bank's investors and depositors "by converting it to a viable Credit Union to provide more options for customers in need of financing which in turn provides job creation." Even assuming that the Bank would accept this apparently unsolicited intrusion from the Debtor and his team of experts, the project has nothing to do with the assets and liabilities of the Debtor or a

reorganization or resuscitation for the Debtor under chapter 11 of the Bankruptcy Code.

19. The other "Immediate Project" envisioned by the Debtor involves property located in Wake County identified as "River Place" which is another property not owned or controlled by the Debtor. Pursuant to this project, the Debtor and his team of experts will "work with owner and officials to create a multi-use commercial space." The plan apparently is for this property to become the site of various new businesses to be operated by the Debtor under his "Waterfront Sportsman" brand "with a priority on job creation for possibly wholesale/retail manufacturing business, job creation for unemployment/under employed, and returning veterans." Whether the owner of the property is willing for his property to be appropriated by the Debtor or how this project would be funded is not addressed by the Debtor. More importantly for purposes of the motions now before the court, merely being able to describe this speculative and unlikely future project is indicative of neither an ability to reorganize nor a plausible component of a chapter 11 resuscitation of the Debtor.

20. The Debtor's Work-out Plan also describes a number of "Future Projects." These projects involve various environmental projects envisioned by the Debtor. None of them deal with any assets that are owned by the Debtor nor with legal claims against the Debtor and none have any relationship to a legitimate

utilization of chapter 11.

21. While the Debtor may have visions of future projects and possible businesses, the fact is that the Debtor currently has no ongoing business to protect nor any means for resuscitation in the manner contemplated under chapter 11. There being no ongoing business in existence, there is no going concern value to preserve nor any property or means for resuscitating a financially troubled debtor. There is no realistic possibility of an effective reorganization because realistically there is nothing to reorganize or resuscitate and no sensible, plausible plans for anything to reorganize. The Debtor has no potential to emerge from this Chapter 11 proceeding in a rehabilitated condition—that is, ready to carry on with viable business operations. There is no current or potential going concern value associated with this debtor and no suggestion that Chapter 11 could be used to wring any going concern value out of the debtor nor result in the assets being liquidated for any greater return than they could in Chapter 7 or elsewhere. Under the totality of the circumstances of this case, it is clear that the purposes of the Bankruptcy Code would not be furthered or advanced by permitting this case to continue. The bottom line is that there is neither going concern value to preserve nor a realistic chance of an effective reorganization or resuscitation and it would be futile for this debtor to continue in Chapter 11.

22. Under the <u>Carolin</u> decision the subjective bad faith

inquiry is designed to insure that the petitioner actually intends to use the provisions of Chapter 11 to reorganize or rehabilitate an existing enterprise or preserve going concern value of a viable or existing business. Stated obversely, the aim of this inquiry is to determine whether the petitioner's real motivation is to abuse the reorganization process and to delay creditors without an intent or ability to reorganize the debtor's financial affairs. Carolin, supra at 702.

23. In this case, as observed above, the debtor has no income beyond the subsistence level, very limited assets, no ongoing, viable business enterprise to rehabilitate and no going concern value to preserve. The court thus is satisfied that this case was not filed with any actual intent to use the provisions of Chapter 11 to reorganize or rehabilitate any ongoing business enterprise nor to preserve going concern value which is nonexistent. This case, instead, was filed in order to stall and delay the Civil Action pending against the Debtor in the United States District Court for the Eastern District of North Carolina. Moreover, this is the second filing by the Debtor for the purpose of stalling and delaying the Civil Action. Throughout this case the Debtor repeatedly has exhibited and expressed strong animosity and enmity for the plaintiff in the Civil Action and the plaintiff's attorney. What has happened in this case is that a bitter, hotly contested controversy has boiled over from the Civil

Action into the bankruptcy court. Chapter 11 was not intended simply to provide a means to delay and frustrate ongoing litigation against the debtor. An attempt to use a bankruptcy filing for such a purpose is an abuse of the bankruptcy process which warrants the dismissal of a Chapter 11 filing. See In re Donuts of Seekonk, 122 B.R. 172 (Bankr. D.R.I. 1990); In re Edwards, 140 B.R. 515 (Bankr. W.D. Mo. 1992); In re Sutton, 78 B.R. 341 (Bankr. S.D. Fla. 1987). The present case involves a classic two-party dispute which is resolvable in the trial court. The filing was intended, not for the purpose of reorganization or resuscitation under chapter 11, but to delay and frustrate the efforts of the plaintiff in the Civil Action to obtain an adjudication of his claim against the Debtor.

24. The Debtor's bad faith is illustrated by the frivolous and nonsensical filings he has made throughout this case. These filings include a "Request by Debtor for Stay Be Extended" (Docket #33) in which he attempted to describe a "Bobby Ginn/Weyerhaeuser/PGA/NASCAR Ponzi scheme" and "ask that all payments for the last 90 days to banks or lenders be clawed back to the M. Dale Swiggett Estate to cover forensic examinations of the Bobby Ginn/Weyerhaeuser Race Team contracts and developments." Another of the Debtor's filings is entitled "Motion for Hearing for Contracts be Rendered Null & Void" (Docket #73). In this filing the Debtor accuses the owner, former owner, engineer, lenders and

others of misconduct pertaining to the "Piedmont Crescent/Quarry Hills" golf course and requests that "all contracts related to Piedmont Crescent/Quarry Hills be rendered Null & Void since Feb. 4, 1969." In another filing entitled "Request for Motion Hearing for Show Cause" (Docket #75) the Debtor seeks to require an attorney who had met with the Debtor previously to appear for a show cause hearing. According to the motion, the attorney thereafter met with other persons without the Debtor being present which prompted the Debtor to file a "Claim of Lien" against the attorney. The purpose of the requested show cause hearing is to require the attorney "to show cause why the enclosed Claim of Lien not be executed and liquidation begin." Apart from being procedurally irregular, these filings are without any legal basis and seek relief that is not warranted under bankruptcy law or other substantive law. Such filings create unnecessary uncertainty and confusion and result in a wasteful expenditure of the time and resources of the court as well as the persons and entities targeted by the Debtor. The filing of such motions and claims of lien purportedly in the context of a chapter 11 case is a flagrant abuse of the bankruptcy process and strongly evidences bad faith on the part of the Debtor in commencing this case.

25. Based upon the totality of the circumstances shown by the evidence both objective futility and subjective bad faith on the part of the debtor have been established.

26. The purposes of the Bankruptcy Code would not be furthered or advanced by permitting the Debtor to continue in Chapter 11.

27. Cause exists for the dismissal of this case within the meaning of section 1112(b).

28. The motion to dismiss filed on behalf of William C. Mann and the United States Bankruptcy Administrator should be granted and this Chapter 11 case should be dismissed. Moreover, given the fact that there have been multiple filings by the Debtor, the fact that none of the filings were in good faith and the bad faith exhibited by the Debtor throughout this proceeding, the Debtor should be barred for a period of 180 days from commencing any case under either chapter 11, chapter 12 or chapter 13 of the Bankruptcy Code or otherwise seeking relief under those chapters of the Bankruptcy Code. An order so providing shall be entered contemporaneously with the filing of this memorandum opinion.

This 10th day of September, 2012.

_____
WILLIAM L. STOCKS
United States Bankruptcy Judge

PARTIES IN INTEREST

Maurice D. Swiggett
5515 Alton Court
Mebane, NC 27302

James B. Craven, Esq.
P.O. Box 1366
Durham, NC 27702

Michael D. West, Bankruptcy Administrator